UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

GALVESTON FIREFIGHTERS' PENSION : Civil Action No.: 1:26-cv-6679
FUND, Individually and on Behalf of All :
Others Similarly Situated, : CLASS ACTION
:
Plaintiff, : DEMAND FOR JURY TRIAL
:
vs. :
:
SMARTSHEET INC., MARK P. MADER, :
and PETE GODBOLE, :
:
Defendants. :
:
———————————————————————— x

**COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

Plaintiff Galveston Firefighters' Pension Fund ("Plaintiff"), on behalf of itself and all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Smartsheet Inc. ("Smartsheet" or the "Company"), conference call transcripts, Company press releases, and media reports about the Company, as well as publicly available information about Blackstone Inc. ("Blackstone") and Vista Equity Partners Management, LLC ("Vista") (collectively, the "Consortium"). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all sellers of the common stock of Smartsheet between June 1, 2024, and September 23, 2024, inclusive (the "Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Smartsheet and certain of the Company's senior officers and directors during the Class Period ("Defendants," defined fully below).

2. This action arises from Defendants' material omissions and misrepresentations concerning the Consortium's offers to purchase all of Smartsheet's outstanding common stock at significant premiums to the Company's stock price and the Company's repurchases of millions of dollars' worth of its shares without disclosing material nonpublic information about the

Consortium's offers, which, if disclosed as required, would have indicated to investors that Smartsheet's stock was worth significantly more.

3.    On January 24, 2024, the Consortium approached Smartsheet with a credible offer to acquire all of the Company's outstanding stock for $56.25 cash per share – a significant cash premium over Smartsheet's January 24, 2024, closing stock price of $46.41 per share. The next day, Smartsheet's Board of Directors ("Board") decided to reject this initial offer. On February 2, 2024, Blackstone informed Smartsheet's CEO Mark Mader of Blackstone's continued interest in Smartsheet. On March 25, 2024, Vista informed Smartsheet that it had started acquiring Smartsheet common stock in open market transactions and that Vista intended to file a notification letter to the antitrust authorities pursuant to the Hart-Scott-Rodino Antitrust Improvements Act. Vista thereafter filed ownership reports with the SEC indicating a significant increase in its holdings in Smartsheet common stock.

4.    In April 2024, the Board approved a share repurchase program under which Smartsheet could repurchase up to $150 million of its outstanding common stock (the "2024 Program").

5.    The Proposed Class Period starts on June 1, 2024, when Smartsheet began repurchasing shares under the 2024 Program with knowledge of the Consortium's continued interest in acquiring Smartsheet, and that Vista was purchasing Smartsheet common stock related to that potential acquisition of Smartsheet.

6.    On June 24, 2024, Mader had a dinner meeting with representatives from the Consortium at their request. During the meeting, the Consortium communicated its continued interest in pursuing an acquisition of Smartsheet but did not make any formal proposal during the meeting. On June 27, 2024, the Board met, Mader informed the Board of his conversations with

the Consortium, the Board created a "Transaction Committee" of certain directors to, among other things, facilitate the Board's involvement in the Company's discussions and consideration of strategic alternatives, including potential negotiations with the Consortium or any other party, and agreed to retain a financial advisor in connection with the Transaction Committee's work. The Board eventually engaged Fenwick & West LLP ("Fenwick") and Qatalyst Partners LP ("Qatalyst") for legal and financial advice.

7.      On July 8, 2024, the Consortium made a revised proposal to acquire all of the outstanding Smartsheet common shares for $56.50 in cash per share. The proposal indicated, among other things, that the Consortium expected Smartsheet to agree to negotiate with the Consortium on an exclusive basis, but that they would be willing to include a "go-shop" provision in the definitive agreement. The closing price of Smartsheet common stock on July 8, 2024, was $43.73 per share.

8.      The next day, the Transaction Committee met to discuss the July 8, 2024 proposal, and determined that it would not enter into exclusive negotiations with the Consortium. Smartsheet engaged with the Consortium and a number of additional potential acquirers concerning a sale of Smartsheet. Smartsheet executed confidentiality agreements with the Consortium and other potential acquirers, and gave the Consortium and other potential acquirers access to an electronic data room. By July 16, 2026, the Consortium had commenced its due diligence, including meetings with Smartsheet management.

9.      From July through September 2024, members of Smartsheet's management continued to engage in confirmatory due diligence calls and meetings with, and responded to written due diligence requests from, representatives of the Consortium.

10.     On August 21, 2024, after over a month of due diligence, the Consortium delivered to Smartsheet a revised non-binding proposal to acquire all outstanding shares of Smartsheet for $56.50 in cash per share. The closing price of Smartsheet common stock on August 21, 2024, was $49.72 per share. As evidence of the proposal's seriousness, the August 21, 2024 proposal indicated that the Consortium had completed its business due diligence of the Company and was confident that it could execute a definitive merger agreement four weeks from the date it was permitted to engage prospective debt financing sources. On August 23, 2024, the Transaction Committee decided to enter into confirmatory due diligence and negotiate a definitive agreement with the Consortium.

11.     On September 24, 2024, prior to market open, Smartsheet issued a press release announcing the execution of a merger agreement for the Consortium to acquire Smartsheet for $56.50 per share.

12.     However, between June 1, 2024, and August 31, 2024, during the time Smartsheet was engaged in active negotiations and due diligence with the Consortium, Smartsheet repurchased over 1,128,000 shares of its own shares at an average price of $44.34 per share. Specifically, as reported in the Company's SEC filings, (a) between June 1 and June 30, 2024, Smartsheet repurchased 420,000 of its shares for an average price of $42.40 per share, or for a total cost of $17,808,000, and (b) between July 1 and July 31, 2024, Smartsheet repurchased 498,000 shares of Smartsheet common stock for an average price of $45.25 per share, or for a total of $22,534,500. These shares were purchased despite knowing that the Consortium was interested in an acquisition of Smartsheet, Vista was buying shares of Smartsheet related to such an acquisition, and, after July 8, 2024, the Consortium was willing to pay a per share price significantly above the price that at

which Smartsheet's common stock was then trading, and that Smartsheet was engaging with the Consortium and other potential acquirers concerning an acquisition.

13. Further, between August 1, 2024, and August 31, 2024, Smartsheet repurchased 210,000 shares of Smartsheet common stock at an average price of $46.05 per share, or for a total amount of $9,670,500, at a time when Smartsheet had already received the July 8, 2024 proposal (for $56.50 cash per share) were in active discussions and due diligence efforts with the Consortium.

14. Defendants violated Section 10(b) and Rule 10b-5 by failing to either abstain from trading in Smartsheet's stock or to disclose the Consortium's offer(s) while buying back Smartsheet's stock. The magnitude of the proposed transaction, the credibility of the bid by companies of Blackstone and Vista's stature, and the degree of interest shown by the Consortium, in total, illustrate that the Consortium's offer would have been material and significant to a reasonable investor in making their investment decision.

15. However, Smartsheet made no disclosure concerning the Consortium's offers, while the Company repurchased millions of dollars of its own shares at prices far below the Consortium's offers. In total, Smartsheet repurchased 1,128,000 of its outstanding shares from unsuspecting investors for approximately $50 million between June 2024 and August 2024, despite knowing that the Consortium was proposing offers at a significant premium to Smartsheet's then stock price.

16. At the same time, Defendants made misleading statements touting this significant repurchase activity, updating investors about these buybacks during the Class Period, all with no disclosure concerning the Consortium's credible offer(s) to acquire Smartsheet shares at materially higher prices. As a result, Smartsheet omitted material information about the Consortium's offers

that the Company had a duty to disclose, and Defendants made material misrepresentations about Smartsheet's repurchases, in violation of the federal securities laws.

17.    When investors learned the truth that the Consortium was willing to buy all of the Company's outstanding stock for a significant premium above the trading price, Smartsheet's stock price climbed sharply.

18.    This action seeks damages on behalf of sellers of Smartsheet stock during the Class Period who were harmed as a result of these violations of the federal securities laws by Defendants.

## JURISDICTION AND VENUE

19.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

20.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the 1934 Act, 15 U.S.C. § 78aa.

21.    Venue is proper in this District pursuant to Section 27 of the 1934 Act and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in this District, and Smartsheet's common stock was listed and traded on the New York Stock Exchange ("NYSE"), which is headquartered in this District.

22.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE.

**PARTIES**

**Plaintiff**

23.    Plaintiff Galveston Firefighters' Pension Fund, as set forth in the accompanying certification, which is incorporated here by reference, sold Smartsheet common stock during the Class Period and was damaged thereby.

**Defendants**

24.    Defendant Smartsheet is a Washington corporation with its corporate headquarters located at 500 108th Ave NE, Suite 200, Bellevue, WA 98004. Smartsheet is a software-as-a-service company that offers its cloud-based work management platform and other professional services. On January 22, 2025, Smartsheet was acquired by the Consortium in an all-cash transaction. During the Class Period, Smartsheet common stock traded in an efficient market on the NYSE. As of November 29, 2024, Smartsheet had outstanding approximately 140 million shares of common stock.

25.    Defendant Mark P. Mader ("Mader") was, at all relevant times, President and Chief Executive Officer ("CEO") of Smartsheet, and a member of the Board.

26.    Defendant Pete Godbole ("Godbole") was, at all relevant times, Chief Financial Officer ("CFO") and Treasurer of Smartsheet.

27.    Defendants Mader and Godbole were senior executives of Smartsheet and are sometimes referred to herein as the "Individual Defendants."

28.    Smartsheet, Mader, and Godbole are collectively referred to herein as "Defendants."

29.    The Individual Defendants made, or caused to be made, false statements and/or omitted to disclose material information that artificially deflated the price of Smartsheet common

stock during the Class Period. The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Smartsheet's press releases, interim financial reports, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions within the Company and their access to material, nonpublic information, the Individual Defendants knew that the facts specified herein had not been disclosed to and were being concealed from the public and that the representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements and material omissions pleaded herein.

30.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose nonpublic facts known to them about Smartsheet and the true market value of its common stock. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on sellers of Smartsheet common stock was a success, as it: (i) deceived the investing public regarding Smartsheet's prospects; (ii) artificially deflated the market price of Smartsheet common stock; and (iii) caused Plaintiff and other members of the Class (defined herein) to sell Smartsheet common stock at artificially deflated prices.

31.    The Individual Defendants made, or caused to be made, materially false and misleading statements and omissions of material fact that caused Smartsheet's common stock to trade at artificially depressed or deflated levels during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of, and had the ability and opportunity to prevent the issuance or cause the correction of,

Smartsheet's public statements, as alleged in this Complaint. Because of their positions with the Company and their access to material nonpublic information available to them but not to the public, the Individual Defendants knew that the facts specified in this Complaint had not been disclosed to and were being concealed from the market, and that Smartsheet's representations were materially false and misleading at the time they were made. The Individual Defendants are liable for the material omissions and false and misleading statements pled in this Complaint.

## RELEVANT NON-PARTIES

32.     Blackstone is a Delaware corporation with its corporate headquarters located at 345 Park Avenue, New York, NY 10154. Blackstone is the world's largest alternative asset manager with more than $1.3 trillion in total assets under management as of December 31, 2025. On January 22, 2025, Blackstone, in partnership with Vista, acquired all outstanding common stock of Smartsheet for $56.50 per share.

33.     Vista is a private equity firm focused on investments in software, data, and technology-enabled companies with its headquarters located at Four Embarcadero Center, 20th Floor, San Francisco, CA 94111. On January 22, 2025, Vista, in partnership with Blackstone, acquired all outstanding common stock of Smartsheet.

## DEFENDANTS' FRAUDULENT SCHEME

34.     In April 2024, the Smartsheet Board approved the 2024 Program under which Smartsheet could repurchase from time to time up to $150 million of its outstanding common stock.

35.     Under the 2024 Program, shares could be repurchased from time to time in open market transactions, in privately negotiated transactions, or otherwise, and the timing and the other terms of the repurchase were subject to the discretion of the Company's management and depended

9

on a variety of factors, including legal requirements, economic and market conditions, and other investment opportunities.

36.    As detailed further herein, at the time that Smartsheet was repurchasing Smartsheet stock throughout the Class Period, Defendants knew that Smartsheet had received a formal acquisition offer from the Consortium to purchase all outstanding shares of Smartsheet common stock at prices significantly above the then-current market prices of Smartsheet common stock, and therefore significantly above the prices at which Smartsheet was repurchasing Smartsheet common stock from unsuspecting Class members. Accordingly, Smartsheet had an obligation to disclose that it had received a formal acquisition offer from the Consortium, or abstain from purchasing Smartsheet stock from unsuspecting investors. Smartsheet did not disclose this material information during the Class Period.

37.    On January 24, 2024, Smartsheet's stock opened at $46.88 per share. On that day, the Consortium delivered to Smartsheet a letter memorializing the Consortium's first offer to acquire all of the outstanding Smartsheet common shares for $56.25 cash per share (the "First Consortium Proposal"). On January 24, 2024, Smartsheet's common stock price closed at $46.41 per share, significantly below the First Consortium Proposal.

38.    Confirming the credibility of the First Consortium Proposal, the Board held a meeting the next day, on January 25, 2024, with members of Smartsheet's senior management, including defendant Mader, to discuss the First Consortium Proposal. During the meeting, the Board reviewed and discussed a forecast of its financial results through fiscal year 2027, the opportunities and risks in continuing to operate as an independent company, and the First Consortium Proposal in light of the Company's prospects as an independent company and analyst consensus estimates. The Board also discussed pending, undisclosed organizational changes and

10

changes to its pricing and packaging model, the potential effect of announcing these changes to investors, and the desirability of waiting to announce these developments before considering a sale process. The Board then discussed the potential risks and benefits of engaging in substantive discussions with the Consortium, including the risk that engaging in further discussions with the Consortium, or engaging in broader outreach, could distract the Company from executing its standalone plan. After discussion, the Board determined to reject the First Consortium Proposal and authorized Smartsheet's financial advisors to inform representatives of the Consortium that the First Consortium Proposal "was not sufficient for our company to engage in further discussions at that time." On January 25, 2024, the date the Board met to discuss the First Consortium Proposal, Smartsheet's common stock price closed at $45.99 per share, significantly below the First Consortium Proposal.

39. Shortly thereafter, on February 2, 2024, a representative from Blackstone called defendant Mader to inform him of Blackstone's continued interest in Smartsheet.

40. On March 25, 2024, a representative from Kirkland & Ellis LLP ("Kirkland"), Vista's outside legal counsel, sent notice in writing to Smartsheet that Vista had begun acquiring shares of Smartsheet's common stock through open market transaction and intended to file a notification letter to the antitrust authorities pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Letter"). The next day, defendant Mader met with representatives from Vista to discuss the HSR Letter.

41. Thus, even though Smartsheet declined the First Consortium Proposal, Defendants were aware that the members of the Consortium were motivated to complete a transaction, and could return with an improved offer.

11

42.     On May 15, 2024, Vista and its affiliates disclosed on in its quarterly report on Form 13F that their position in Smartsheet had increased from 363,271 shares to 2,122,800 shares, as of March 31, 2024. This position amounted to approximately 1.5% of Smartsheet's outstanding shares.

43.     Also, after the market closed on June 5, 2024, Smartsheet hosted an earnings call with analysts and shareholders to discuss the Company's first quarter 2024 ("1Q24") financial results (the "June 2024 Call"). During the June 2024 Call, defendant Godbole told analysts and investors that "[e]arlier in the quarter, we also announced that we received Board authorization for an initial $150 million share buyback. We expect to commence this buyback within the next few days and expect to significantly complete the share repurchases by the end of Q4 of fiscal year '25." Defendant Godbole, however, failed to disclose that Smartsheet had received the First Consortium Proposal to purchase all outstanding shares of Smartsheet common stock for $56.25 cash per share, and Smartsheet had been informed of the Consortium's continued interest and Vista's acquisition of shares and notification to antitrust authorities.

44.     According to the Company's Form 10-Q for 1Q24, dated June 6, 2024 (the "1Q24 Form 10-Q"), which was signed by defendant Mader and Godbole, "[a]ll repurchases under the program will be made … in compliance with applicable securities laws and other requirements."

45.     On June 24, 2024, defendant Mader had a dinner meeting with representatives from the Consortium at their request. During the meeting, the Consortium discussed Smartsheet's business, including market trends and dynamics, the Company's management, and recently announced changes to the Company's pricing and packaging model. The Consortium also communicated its continued interest in pursuing an acquisition of Smartsheet but did not make any formal proposal during the meeting.

46.     On June 27, 2024, the Board held a meeting with members of senior management, including defendant Mader, as well as representatives from Fenwick. During the meeting, defendant Mader discussed his conversations with the Consortium about their interest in a potential transaction with Smartsheet. A representative from Fenwick discussed the Board's fiduciary duties in connection with a potential acquisition transaction and considerations with respect to the review process. The Board also reviewed and discussed a forecast of its financial results through fiscal year 2027. Additionally, the Board created a "Transaction Committee" of certain directors, which would, among other things, facilitate the Board's involvement in the Company's discussions and consideration of strategic alternatives, including potential negotiations with the Consortium or any other party. The Transaction Committee did not have authority to approve any transaction and was not created to address any actual or perceived conflicts of interest. After discussion, the Board agreed to retain Qatalyst to serve as financial advisor. The Board subsequently, on June 28, 2024, entered into a formal engagement letter with Qatalyst.

47.     On July 1, 2024, the Consortium informed representatives from Qatalyst that the Consortium may submit a revised proposal to acquire Smartsheet after July 4, 2024.

48.     On July 8, 2024, the Consortium delivered to Smartsheet a revised proposal to acquire all of the outstanding Smartsheet common shares for $56.50 in cash per share (the "Second Consortium Proposal"). The Second Consortium Proposal provided, among other things, that the acquisition would be financed with a combination of equity and debt financing from third-party lenders, with the Consortium providing a substantial portion of the equity and with select co-investors, to be determined later, providing the rest. The Second Consortium Proposal indicated that the Consortium was confident they could obtain the requisite debt financing commitments prior to signing a definitive transaction agreement. The Second Consortium Proposal also indicated

that the Consortium expected Smartsheet to agree to negotiate with the Consortium on an exclusive basis, but that they would be willing to include a "go-shop" provision in the definitive agreement. The Second Consortium Proposal further indicated that the proposal was not contingent on any individual signing an employment agreement before closing. The closing price of Smartsheet common shares on July 8, 2024, the date the Second Consortium Proposal was received, was $43.73 per share.

49.    That same day, representatives from Qatalyst discussed with the Consortium the Second Consortium Proposal, including, among other things, the Consortium's proposed sources of financing for the proposed transaction.

50.    The next day, on July 9, 2024, the Board held a meeting with members of Smartsheet's senior management, as well as representatives from Fenwick and Qatalyst. During the meeting, Qatalyst summarized the Second Consortium Proposal, the Company's historical stock performance and the current market environment, and reviewed the Second Consortium Proposal from a financial perspective based on the three-year forecast. The Transaction Committee considered the response to the Consortium and whether to approach other financial sponsors and strategic partners to determine their interest in pursuing an acquisition of the Company. During this discussion, Fenwick advised the Transaction Committee on the fiduciary duties of directors in connection with a potential sale of the Company. Qatalyst provided the Transaction Committee with their perspectives on potential financial sponsors and strategic parties that may be interested in an acquisition of the Company and possessed the requisite ability to do so.

51.    At the same meeting, the Transaction Committee discussed, among other things, the 9% decline of Smartsheet's stock price since the First Consortium Proposal, the 11% decline of the Company's share price multiple represented by the Company's revenue for the next 12

14

months based on analysts' estimates, the decline in net bookings, and the decline from 19% to 16% of the Company's revenue growth for the next 12 months based on analysts' estimates. The Transaction Committee also discussed the risks and opportunities that Smartsheet faced as an independent company, the opportunity for a go-shop provision presented by the Second Consortium Proposal, the risk of the sales process distracting senior management from executing the Company's strategic priorities, and the risk that outreach could lead to media leaks and market speculation on the process. After discussion, the Transaction Committee determined that it would not enter into exclusive negotiations with the Consortium and would approach three financial sponsors (Party A, Party B, Party C) and one strategic party (Party D) to determine their interest in submitting a proposal to acquire the Company. Defendant Mader had previously met with Party A and B to discuss Smartsheet's business and their respective investment approach.

52.     Later that day, according to the Definitive Proxy Statement relating to the Merger, filed with the SEC on November 4, 2024 (the "Proxy Statement"), Qatalyst, at the direction of the Transaction Committee, informed the Consortium that Smartsheet "would not agree to any exclusivity period prior to the execution of a definitive agreement, but that [it] would be willing to provide the Consortium members with access to non-public financial due diligence information and access to [its] senior management, with the expectation that following such due diligence, the Consortium would provide a revised proposal on July 26, 2024 thereafter." Qatalyst also invited the four additional parties to receive the same non-public financial due diligence and consider making a proposal to acquire the Company. Party A, Party B, and Party D subsequently expressed their interest in evaluating such a transaction.

53.     Despite agreeing that it would be in the best interest of Smartsheet shareholders to share strategic and financial information with the Consortium and additional parties after receiving

15

the Second Consortium Proposal, Defendants consciously chose not to tell the public about its agreement to share financial information with the Consortium or the additional parties, nor the Consortium's offers to acquire Smartsheet, while at the same time repurchasing millions of dollars of Smartsheet's own shares.

54.    By July 16, 2024, Vista, Blackstone, Party A, Party B, and Party D had executed confidentiality agreements, which all, aside from Party D's agreement, included a standstill provision. In addition, by July 16, 2024, Smartsheet provided Blackstone, Vista, Party A, Party B and Party D with access to an electronic data room containing non-public financial information, including, among other things, a management presentation on the Company's product roadmap, new pricing model, go-to-market plans, and the three-year forecast.

55.    Thereafter, representatives of the Consortium conducted diligence on Smartsheet's business, including its products and technology, its financial results and projections, including the trajectory of its bookings and the impact of changes to its pricing and packaging model, and the financial results for its fiscal second quarter ended July 31, 2024. Members of Smartsheet's management engaged in due diligence calls and meetings with, and responded to written due diligence requests from, representatives of the Consortium. During this period, Smartsheet's management also engaged in due diligence calls and meetings with the additional interested parties.

56.    On July 16, 2024, the Transaction Committee held a meeting with members of Smartsheet's senior management and Board, including defendant Mader, as well as representatives from Fenwick and Qatalyst. During the meeting, Qatalyst discussed the status of discussions with the Consortium and each of the four additional parties regarding their interest in pursuing an acquisition of Smartsheet, including that Party C would not pursue such a transaction. After

16

discussion, the Transaction Committee authorized Qatalyst to approve Blackstone's request to provide confidential information to three of its limited partners, in connection with the process. The Transaction Committee also directed senior management and Qatalyst to continue to engage with the Consortium "to generate an acquisition proposal that would provide superior value to the shareholders."

57.     On July 18, 2024, prior to the close of trading, Reuters published an article disclosing that Smartsheet had attracted acquisition interest from buyout firms.[1] On this news, Smartsheet's common stock price rose to close at $47.81 per share, a 5.4% increase over the closing price on the prior trading day.

58.     On July 26, 2024, the Consortium informed representatives from Qatalyst that the Consortium would not submit a revised proposal to acquire the Company on that date, as previously requested by Qatalyst, and that the Consortium needed additional time to evaluate the Company.

59.     On July 29, 2024, the Transaction Committee held a meeting with members of Smartsheet's senior management and the Board, including defendant Mader, as well as representatives from Fenwick and Qatalyst. During this meeting, Qatalyst discussed the status of the strategic process, including that the Consortium had requested additional time and diligence materials to evaluate the Company before making a revised proposal, and that none of the prior four interested parties had made an acquisition proposal. Qatalyst also described the indications of acquisition interest received from four additional financial sponsors (Party E, Party F, Party G, and

---

[1] Milana Vinn, Anirban Sen, *Exclusive: Collaboration software marker Smartsheet fields buyout interest, sources say*, REUTERS (July 18, 2024), https://www.reuters.com/technology/collaboration-software-maker-smartsheet-fields-buyout-interest-sources-say-2024-07-18/.

Party H). After discussion, the Transaction Committee directed management and Qatalyst to continue engaging with the Consortium with respect to a revised acquisition proposal. The Transaction Committee also directed Qatalyst to engage with Party E and Party G to determine their interests in pursuing a potential acquisition transaction but determined not to engage with Party F or Party H. At the same meeting, the Board reviewed an updated forecast of Smartsheet's financial performance as an independent company for fiscal years 2025 through 2035 (the "Financial Projections"). After discussion, the Board approved the Financial Projections for use by Qatalyst in its financial analysis.

60.    On July 30, 2024, Party G had executed confidentiality agreements, which included a standstill provision. In connection, Smartsheet provided Party G access to an electronic data room containing non-public financial information, including, among other things, a management presentation on the Company's product roadmap, new pricing model, go-to-market plans, and the three-year forecast. That same day, Party E informed Qatalyst that it was no longer interested in discussing a potential acquisition of Smartsheet at that time.

61.    On August 8, 2024, Smartsheet received an indication of interest from Party I, an additional financial sponsor.

62.    On August 14, 2024, Vista and its affiliates disclosed on in its quarterly report on Form 13F that their position in Smartsheet had increased from 2,122,800 shares to 6,466,672 shares, as of June 30, 2024. This position amounted to approximately 4.7% of Smartsheet's outstanding shares.

63.    Then, on August 21, 2024, after over a month of due diligence, the Consortium delivered to Smartsheet a revised non-binding proposal to acquire all outstanding shares of Smartsheet for $56.50 in cash per share (the "Final Consortium Proposal"). The closing price of

18

Smartsheet common stock on August 21, 2024, was $49.72 per share. The Final Consortium Proposal stated that the proposal was the Consortium's "best and final offer," and highlighted the premium represented by the proposal. The Final Consortium Proposal indicated that the Consortium had completed its business due diligence of the Company and was confident that it could execute a definitive merger agreement four weeks from the date it was permitted to engage prospective debt financing sources. The Final Consortium Proposal also stated that the acquisition would be financed with a combination of equity and debt from third-party lenders, with a substantial portion of the equity coming from the Consortium, and that the Consortium was confident that it could obtain the requisite debt financing commitments prior to signing a definitive transaction agreement. The Final Consortium Proposal further stated that the Consortium was not contingent on any individual signing an employment agreement and that the Consortium expected to enter into exclusive negotiations with respect to a transaction.

64.     On August 23, 2024, the Transaction Committee held a meeting with members of Smartsheet's senior management and the Board, as well as representatives from Fenwick and Qatalyst. During the meeting, Qatalyst reviewed its initial outreach to prospective financial sponsors and strategic parties for a potential acquisition transaction and the inbound interest received after the publication of the July 18, 2024 Reuters article. Qatalyst discussed the Final Consortium Proposal, including the proposed terms, the Consortium's request for exclusive negotiations, and a preliminary financial analysis based on the Financial Projections. Thereafter, the Transaction Committee and Qatalyst discussed the potential response to the Consortium considering the Consortium's stated view that the proposal was its "best and final offer," and the Transaction Committee's belief that the Consortium was unlikely to abandon the Final Consortium Proposal if the Company declined to enter into exclusive negotiations with the Consortium.

19

Fenwick discussed the Board's fiduciary duties in evaluating the request for exclusivity and in considering a "go-shop" provision. After discussion, the Transaction Committee instructed Qatalyst to inform the Consortium that the Company would proceed to provide confirmatory due diligence and negotiate a definitive agreement on the terms set forth in the Final Consortium Proposal, provided that, among other things, the Company would not enter into exclusivity and the definitive agreement would provide for a 45-day "go-shop period," a termination fee payable to Smartsheet under certain circumstances, and a reverse termination fee payable to the Consortium under certain circumstances.

65.    That same day, at the direction of the Transaction Committee, Qatalyst informed the Consortium that the Company would not enter into an agreement to negotiate on an exclusive basis and discussed the go-shop and termination fee terms. The Consortium confirmed that it would proceed with non-exclusive negotiations regarding an acquisition transaction on these terms.

66.    Beginning on August 24, 2024, representatives from the Consortium initiated confirmatory due diligence, including operational, product, accounting, and legal due diligence.

67.    On August 27, 2024, the Board met with members of Smartsheet's senior management, as well as representatives from Fenwick and Qatalyst to discuss the status of negotiations with the Consortium. After discussion, the Board instructed Fenwick to prepare an initial draft of the merger agreement ("Merger Agreement") and contact Kirkland and Simpson Thacher & Bartlett LLP ("STB"), Blackstone's legal advisor, to commence negotiation of the Merger Agreement.

68.    On September 4, 2024, representatives from Fenwick delivered an initial draft of the Merger Agreement to Kirkland and STB, which provided for, among other things, a 45-day

20

go-shop period, termination fee provisions, and an affirmative duty for the Consortium to litigate against regulatory challenges to the Merger and to refrain from making acquisitions that would delay approval.

69.     On September 5, 2024, prior to the close of trading, Reuters published an article disclosing that Vista and Blackstone were engaged in discussions to acquire Smartsheet.[2] On this news, Smartsheet's common stock price rose to close $49.35 per share, a 4.2% increase over the closing price on the prior trading day.

70.     After the market closed on September 5, 2024, Smartsheet announced its financial results for the fiscal second quarter ended July 31, 2024 ("2Q24") and hosted an earnings call with analysts and shareholders to discuss the Company's 2Q24 financial results (the "Sep. 2024 Call"). During the Sep. 2024 Call, defendant Godbole told analysts and investors that "in Q2, we launched our share buyback program and repurchased 918,000 shares for a total of $40 million in the quarter." Defendant Godbole, however, failed to disclose that during 2Q24, Smartsheet had received an offer to purchase all outstanding shares of Smartsheet common stock for $56.50 per share in cash, and had engaged with potential acquirers.

71.     Moreover, in the Company's Form 10-Q for 2Q24, dated September 6, 2024 (the "2Q24 Form 10-Q"), which was signed by defendants Mader and Godbole, Smartsheet provided a month-by-month breakdown of its share repurchases for 2Q24:

| Date | Total Number of Shares Purchased | Average Price Paid Per Share |
|---|---|---|
| May 1, 2024 through May 31, 2024 | N/A | N/A |

[2] Milana Vinn, *Exclusive: Vista and Blackstone in talks to acquire software makers Smartsheet, sources say*, REUTERS (Sep. 5, 2024), https://www.reuters.com/markets/deals/vista-blackstone-talks-acquire-software-maker-smartsheet-sources-say-2024-09-05/.

| June 1, 2024 through June 30, 2024 | 420,000 | $42.40 |
|---|---|---|
| July 1, 2024 through July 31, 2024 | 498,000 | $45.25 |
| **Total** | **918,000** | **$43.95** |

72. As demonstrated by the above chart, Defendants repurchased 918,000 shares of Smartsheet common stock during the period from June 1, 2024, through July 31, 2024, meaning that a significant portion of these purchases were made *after* Defendants received the Second Consortium Proposal on July 8, 2024. Defendants repurchased these shares for an average price of $43.95 per share, despite knowing – and refusing to disclose to investors – that the Consortium was willing to pay per share prices significantly above the price that at which Smartsheet's common stock was then trading. Indeed, during this entire period, Defendants were aware of the Consortium's continued interest in an acquisition of Smartsheet, as well as Vista's acquisition of stock and notification to antitrust authorities. While Defendants disclosed these repurchases, they categorically failed to disclose the other material nonpublic information in their possession.

73. Smartsheet's 2Q24 Form 10-Q, stated the following regarding Smartsheet's share repurchase program:

In April 2024, the Company's Board of Directors authorized the repurchase of up to $150 million of the Company's outstanding Class A common stock. Repurchases under the program are made through open market, block trades, and/or privately negotiated trades pursuant to 10b5-1 plans, in compliance with applicable securities laws and other requirements. The program has no minimum purchase commitment and may extend over a period of up to 12 months. The timing, manner, price, and amount of the repurchases are subject to the discretion of the company's management. The repurchase program does not obligate the Company to acquire any particular amount of Class A common stock and it may be suspended or discontinued at any time.

74. The statement quoted above that Smartsheet's share repurchases complied with the applicable securities laws remained current on the market as Smartsheet's most recent statement

on this subject until the filing of Smartsheet's next Form 10-Q in December 2024. Rule 10b-18 confers no immunity from possible Rule 10b-5 liability where the issuer engages in repurchases while in possession of material, nonpublic information concerning its securities, or where purchases are part of a plan or scheme to evade the federal securities laws. This statement is actionable and materially false and misleading because Smartsheet repurchased stock in June 2024, July 2024, and August 2024, while aware of material nonpublic information concerning, among other things, the Second Consortium Proposal, and the Final Consortium Proposal and the Consortium's continuous interest in acquiring Smartsheet for a premium over its stock's market price. Therefore, Smartsheet and the Individual Defendants came under an obligation to either disclose the material nonpublic information about the Consortium's proposals or abstain from trading Smartsheet stock. Accordingly, Defendants had an obligation to update the statement quoted above, but failed to do so and instead continued to repurchase Smartsheet stock in violation of Section 10(b), Rule 10b-5, and Rule 10b5-1.

75.    On September 13, 2024, prior to the close of trading, Bloomberg published an article disclosing that Blackstone and Vista were seeking $3.2 billion in private debt to finance an acquisition of Smartsheet.[3] On this news, Smartsheet's common stock price rose to $52.22 per share, a 3.3% increase over the closing price on the prior trading day.

76.    On September 16, 2024, prior to the close of trading, Reuters published an article disclosing that Blackstone and Vista were nearing a $8 billion deal to purchase Smartsheet.[4] On

---

[3] Paula Seligson, *Vista, Blackstone Seek $3.2 Billion Private Debt for Smartsheet*, BLOOMBERG (Sep. 13, 2024), https://www.bloomberg.com/news/articles/2024-09-13/vista-blackstone-seek-3-2-billion-private-debt-for-smartsheet.

[4] Milana Vinn, *Exclusive: Vista and Blackstone nearing $8-billion deal to buy Smartsheet, sources say*, Reuters (Sep. 16, 2024), https://www.reuters.com/markets/deals/vista-blackstone-nearing-8-billion-deal-buy-smartsheet-sources-say-2024-09-16/.

this news, Smartsheet's common stock price rose to $52.69 per share, a 0.9% increase over the closing price on the prior trading day.

77.     During the months of August 2024 and September 2024, members of Smartsheet's management continued to engage in confirmatory due diligence calls and meetings with, and responded to written due diligence requests from, representatives of the Consortium. During that same period, representatives from Smartsheet and the Consortium negotiated the Merger Agreement. Even as negotiations and due diligence with the Consortium escalated, Defendants still refused to inform investors about a potential transaction with the Consortium.

78.     On September 22, 2024, representatives from Kirkland and STB delivered a revised draft of the Merger Agreement to Fenwick.

79.     The next day, September 23, 2024, the Board held a meeting with members of Smartsheet's senior management, as well as representatives from Fenwick and Qatalyst. During the meeting, Qatalyst presented its financial analysis of the merger and indicated that it would be prepared to deliver an opinion that the Merger Agreement on the terms contemplated would be fair to holders of Smartsheet's common stock. Later that day, Fenwick, Kirkland, and STB finalized negotiations of the Merger Agreement.

80.     On September 24, 2024, the Board held a meeting with members of Smartsheet's senior management, as well as representatives from Fenwick and Qatalyst. During the meeting, Qatalyst rendered its opinion that the consideration provided by the Merger Agreement was fair to holders of Smartsheet's common stock. The Board unanimously determined that the Merger Agreement was in the best interest of Smartsheet and its shareholders. Later that morning, Smartsheet, Blackstone, and Vista executed the Merger Agreement memorializing the acquisition of Smartsheet by the Consortium for $56.50 per share.

81. That same day, on September 24, 2024, prior to market open, Smartsheet issued a press release announcing the execution of the Merger Agreement. Finally, Defendants informed investors that the Consortium was willing to pay a significant premium over the market price for Smartsheet common stock. On this news, Smartsheet's common stock price rose to $55.46 per share at market close on September 24, 2024, a 6.5% increase over the closing price on the prior trading day.

82. After the Class Period, on December 5, 2024, Smartsheet filed on Form 10-K its financial results for fiscal third quarter 2024 (the "3Q24 Form 10-Q"), which was signed by defendants Mader and Godbole. In the 3Q24 Form 10-Q, Smartsheet disclosed that, in the quarter ended October 31, 2024 ("3Q24"), it had repurchased 210,000 shares of Smartsheet common stock at an average price of $46.05 per share, for a total of approximately $9.7 million dollars.

83. The 3Q24 Form 10-Q included Smartsheet's share repurchases in 3Q24 by month, depicted below:

| Date | Total Number of Shares Purchased | Average Price Paid per Share |
|---|---|---|
| August 1, 2024 through August 31, 2024 | 210,000 | $46.05 |
| September 1, 2024 through September 30, 2024 | N/A | N/A |
| October 1, 2024 through October 31, 2024 | N/A | N/A |
| **Total** | **210,000** | **$46.05** |

84. Between August 1, 2024, and August 31, 2024, Defendants had already received the Second Consortium Proposal (for $56.50 cash per share) on July 8, 2024, and had engaged with the Consortium and other potential acquirers concerning an acquisition. In addition, Defendants received the Final Consortium Proposal (for $56.50 cash per share) on August 21,

25

2024, during this window. Despite knowing that the Consortium was willing to pay approximately 22.7% more than the average $46.05 price per share Smartsheet was paying to its shareholders, Defendants refused to disclose this information to investors in order to keep Smartsheet's common stock price artificially deflated.

## DEFENDANTS ACTED WITH SCIENTER

85. Smartsheet and the Individual Defendants acted with scienter because Defendants had actual knowledge of the material undisclosed facts concerning the Consortium's credible offer(s) to acquire Smartsheet shares at materially higher prices that rendered their public statements materially false and misleading.

86. Defendants were aware of the details and timing of the Consortium's offers. The Consortium communicated its offers to the highest executive level of Smartsheet – delivering its offers directly to defendant Mader – and its offers were discussed at multiple Board meetings, which were attended by defendants Mader and Godbole.

87. Defendants were aware of Smartsheet's repurchases of millions of dollars of its own stock. Among other things, Defendants disclosed these repurchases in the 2Q24 Form 10-Q and the 3Q24 Form 10-Q, filed in September 2024 and December 2024, respectively. Defendants Mader and Godbole signed these filings and certified their completeness and accuracy. Moreover, Smartsheet's disclosures about the repurchases stated that "*Repurchases under the program are made through open market, block trades, and/or privately negotiated trades pursuant to 10b5-1 plans, in compliance with applicable securities laws and other requirements. … The timing, manner, price, and amount of the repurchases are subject to the discretion of the company's management.*" Defendant Godbole spoke about the repurchases on earnings calls.

88.    Defendants were aware of the market price of Smartsheet's stock and were therefore aware that the Consortium's offers were at prices materially above the market price, and that Smartsheet's repurchases were at prices materially below the Consortium's offers. Defendants were also aware that, even if they rejected an offer, the Consortium could return with an improved offer.

89.    The magnitude and pace of Smartsheet's stock repurchases during the Class Period also supports a strong inference of scienter. After learning of the Consortium's interest in a transaction, Smartsheet authorized a new share repurchase plan and subsequently repurchased approximately $50 million worth of stock during the Class Period.

90.    In addition to Defendants' actual awareness of the undisclosed material facts, the inference of scienter is enhanced further by the financial motive Defendants had for Smartsheet to repurchase millions of its shares at prices artificially deflated by Defendants' failure to disclose the Consortium's offer to acquire those shares at materially higher prices. This strategy would have failed if Defendants had disclosed the Consortium's offer before conducting the repurchases, because the stock price would have increased and Defendants would have been unable to buy stock opportunistically on the cheap, as they said they intended to do. Thus, Smartsheet's offer and Defendants' awareness that the Company was presented with a material acquisition proposal gave Defendants an additional motive to repurchase stock without disclosing the offer.

## LOSS CAUSATION AND ECONOMIC LOSS

91.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the prices of Smartsheet common stock and operated as a fraud or deceit on sellers of Smartsheet common stock. As detailed above, when the truth about Defendants' misconduct and omissions concerning the

27

Consortium's offers to purchase the company was revealed, the price of Smartsheet common stock increased precipitously as the prior artificial deflation came out. The increase in the price of Smartsheet common stock was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price increase negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially deflate the prices of Smartsheet common stock and the subsequent significant increase in the value of Smartsheet common stock when Defendants' prior misrepresentations, omissions, and other fraudulent conduct were revealed.

92.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Smartsheet's business, operations, and financial prospects as alleged herein. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Smartsheet common stock to be artificially deflated. Plaintiff and other Class members sold Smartsheet common stock at those artificially deflated prices, causing them to suffer damages as complained of herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

93.    Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

94.    Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Smartsheet common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)    Smartsheet common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b)    Smartsheet regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases through major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)    Smartsheet was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

95.    As a result of the foregoing, the market for Smartsheet common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all those who transacted in Smartsheet common stock during the Class Period suffered similar injury through

29

their transactions in Smartsheet common stock at artificially deflated prices and a presumption of reliance applies.

96.    Without knowledge of the misrepresented or omitted material facts, Plaintiff and other Class members sold Smartsheet common stock between the time Defendants omitted, misrepresented, and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Smartsheet common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

97.    Plaintiff brings this action on behalf of all sellers of Smartsheet common stock during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are Defendants, Blackstone, Vista, and the officers and directors of the Company, Blackstone, and Vista (collectively, the "Excluded Persons & Entities"), the Excluded Persons' & Entities' immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any of the Excluded Persons & Entities have or had a controlling interest.

98.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Smartsheet common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Smartsheet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in

30

securities class actions. Upon information and belief, these shares were held by hundreds or thousands of individuals located geographically throughout the country. Joinder would be highly impracticable.

99.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

100.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

101.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether Defendants omitted or misrepresented material facts;

(c)   whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements and/or omissions;

(d)   whether the prices of Smartsheet common stock during the Class Period were artificially deflated because of Defendants' conduct complained of herein; and

(e)   whether the members of the Class have sustained damages and, if so, the proper measure of damages.

102.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Treatment as a class

31

will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication effort or expense that numerous individual actions would require.

103.　Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

104.　No difficulties are likely to be encountered in the management of this action as a class action.

## COUNT I

### For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

105.　Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

106.　During the Class Period, Defendants had access to the material, nonpublic confidential information concerning the Company and its true prospects alleged herein.

107.　Notwithstanding their duty to refrain from trading in Smartsheet common stock unless they disclosed those material, nonpublic, favorable facts alleged herein, and in violation of their fiduciary duties to Plaintiff and other members of the Class, Defendants caused Smartsheet to purchase more than one million shares of Smartsheet common stock at artificially deflated prices.

32

108.    The magnitude of the proposed transaction, the credibility of the bid by companies of Blackstone and Vista's stature, and the degree of interest shown by the Consortium, in total, illustrate that the Consortium's offer would have been material and significant to a reasonable investor in making their investment decision.

109.    Defendants caused Smartsheet to purchase those shares of common stock, as alleged above, at market prices artificially deflated by the nondisclosure of material, nonpublic, favorable facts during the Class Period.

110.    Defendants knew that they were in possession of material, nonpublic, favorable information that was not known to the investing public, including Plaintiff and other members of the Class. Before purchasing that common stock from the public, Defendants were obligated to disclose that material, nonpublic favorable information to Plaintiff and other members of the Class.

111.    By reason of the foregoing, Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon members of the investing public who sold Smartsheet common stock during the Class Period.

112.    Defendants made and issued materially false and/or misleading statements concerning, among other things, the 2024 Program and Smartsheet's stock repurchases, as alleged herein.

113.    Plaintiff and other members of the Class who sold shares of Smartsheet common stock: (i) have suffered substantial damages because they relied upon the integrity of the market and sold shares of Smartsheet common stock at artificially deflated prices as a result of the violations of Section 10(b) and Rule 10b-5 alleged herein; and (ii) would not have sold Smartsheet

common stock at the prices they sold at, or at all, if they had been aware that the market prices had been artificially and falsely deflated by Defendants' concealment and misleading statements. At the time of the sales by Plaintiff and members of the Class, the fair and true value of Smartsheet common stock was substantially more than the prices at which they sold their shares.

114.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their sales of Smartsheet common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants

115.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

116.    During the Class Period, the Individual Defendants acted as controlling persons of Smartsheet within the meaning of Section 20(a) of the 1934 Act. By virtue of their positions within the Company, and their power to control public statements about Smartsheet, the Individual Defendants had the power and ability to control the actions of Smartsheet and its employees. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)    Awarding Plaintiff and the members of the Class damages and interest;

(c)    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

34

(d)     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 5, 2026

WOLF POPPER LLP

*/s/ Joshua W. Ruthizer*
Robert C. Finkel
rfinkel@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Justyn Millamena
jmillamena@wolfpopper.com
570 Lexington Avenue, 19th Floor
New York, NY 10022
Telephone: (212) 759-4600

*Counsel for Plaintiff*

35

**CERTIFICATION OF GALVESTON FIREFIGHTERS' PENSION FUND
PURSUANT TO THE PRIVATE SECURITIES LITIGATION REFORM ACT**

I, Gregg Riley, on behalf of Galveston Firefighters' Pension Fund ("Galveston Firefighters"), declare the following as to the claims asserted or to be asserted under the federal securities laws:

1.      I am the Chairman of Galveston Firefighters. I am authorized to execute this certification on behalf of Galveston Firefighters and authorized to initiate this litigation on behalf of Galveston Firefighters.

2.      Galveston Firefighters has reviewed a draft of the complaint titled *Galveston Firefighters' Pension Fund v. Smartsheet, Inc., et al.,* ("Complaint").

3.      Galveston Firefighters has authorized its counsel in this action, Wolf Popper LLP, to file the Complaint on its behalf.

4.      Galveston Firefighters did not engage in transactions in the securities that are the subject of the Complaint at the direction of its counsel, or in order to participate in any private action arising under the federal securities laws.

5.      Galveston Firefighters is willing to serve as a representative party on behalf of the Class, as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

6.      Galveston Firefighters fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the class.

7.      Attached as **Schedule A** is a list of all of Galveston Firefighters' transactions in the securities that are the subject of the Complaint during the Class Period specified in the Complaint.

8.      During the three-year period preceding the date of signing this certification, Galveston Firefighters has not sought to serve, and has not served, as a representative party on behalf of a class in any private action arising under the federal securities laws.

9.      Galveston Firefighters will not accept any payment for serving as a representative party on behalf of the Class except to receive a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses, including lost wages, relating to the representation of the Class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: August __4__, 2026

By: _____

Gregg Riley

Chairman, Galveston Firefighters' Pension Fund

1

**SCHEDULE A**

**SMARTSHEET, INC. COMMON STOCK TRANSACTIONS**

| Date | Transaction | Shares | Price Per Share * |
|------|-------------|--------|-------------------|
| 6/7/2024 | Purchase | 572 | $43.93 |
| 7/15/2024 | Sale | 572 | $44.29 |

* Per share prices are rounded to two decimal places.

2